**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Case No. 13 CR 950 |
| | ) | |
| GUADALUPE GARCIA, | ) | |
| JUAN PEREZ, and JOSE | ) | |
| SALAZAR-SANDOVAL | ) | |

**MEMORANDUM OPINION AND ORDER**

AMY J. ST. EVE, District Court Judge:

Before the Court are the motions of Defendants Guadalupe Garcia ("Garcia") and Juan Perez ("Perez") to suppress evidence obtained by law enforcement on December 11, 2013. For the following reasons, the Court denies Defendants' motions.

**BACKGROUND**

An indictment charged Defendants Guadalupe Garcia ("Garcia") and Juan Perez ("Perez") with possession of a controlled substance with intent to distribute in violation of 21 U.S.C. § 841(a)(1), and a related forfeiture count.[1] (R. 29, Indictment.) Garcia now moves to suppress the physical evidence recovered and statements obtained from him on the basis that law enforcement entered his apartment on December 11, 2013 in violation of the Fourth Amendment. (R. 77, Am. Mot. to Supp.) Perez moves to quash his arrest and suppress the physical evidence recovered and statements obtained from him during that same incident. (R. 66, Mot. to Quash.)

"Evidentiary hearings are warranted only when the allegations and moving papers are sufficiently definite, specific, non-conjectural and detailed enough to conclude that a substantial

---

[1] The indictment also charged Defendant Jose Salazar-Sandoval ("Salazar-Sandoval"), however, he has not moved to suppress any evidence.

1

claim is presented and that there are disputed issues of material fact which will affect the outcome of the motion." *United States v. Villegas*, 388 F.3d 317, 324 (7th Cir. 2004).

In support of his motion, Garcia swore to its truth. Defendant Perez did not submit an affidavit or otherwise swear to the truth of his motion, but attempted to raise material factual disputes based on alleged inconsistencies in the officers' reports and testimony. Since Garcia's sworn motion and the officers' reports and testimony created a material factual dispute, the Court held a suppression hearing in order to make evidentiary determinations on Garcia's motion. As discussed in more detail below, the Court also granted Perez an evidentiary hearing, but only on one limited issue. The Court held a combined hearing on both motions on October 27, 2014.

## BACKGROUND FACTS

The following witnesses testified at the suppression hearing: Officer Hector Rivera, Department of Homeland Security ("DHS"), Enforcement and Removal Operations ("ERO"); Officer Charles Carter, DHS, ERO; Defendant Guadalupe Garcia; and Nancy Alejandro, Garcia's common-law wife and the mother of four of his children. Defendant Perez did not testify. During the hearing, the Court had the opportunity to carefully evaluate the demeanor and credibility of each witness. The government introduced numerous documentary exhibits, including photographs taken from inside Garcia's apartment. The Court makes the following factual findings based on the evidence presented at the suppression hearing, as well as the other evidence submitted with the briefing on the motions to suppress. Although the parties disputed a number of factual issues regarding the events at Garcia's apartment on December 11, 2013, the Court only addresses those necessary to resolve the pending motions to suppress.

On December 11, 2013, at approximately 12:15 p.m., DHS immigration officers arrived at Garcia's apartment at 5555 S. Washtenaw Avenue in Chicago, Illinois to execute an

administrative arrest warrant for his deportation. (R. 91-3, at 1.) The officers approached Garcia outside his residence near the rear entrance. (10/27/2014 A.M. Tr.) After initially attempting to speak with Garcia in English, Officer Hector Rivera switched to Spanish, and identified the officers and asked Garcia to provide identification. (*Id*.) After the officers verified Garcia's identity, Officer Rivera began to place handcuffs on him. (*Id*.) With his hands behind his back, Garcia tried to pull away his left hand. (*Id*.) Officer Rivera responded by very briefly placing Garcia's arm in a "goose hold"[2] to gain his compliance. (*Id*.) He then successfully handcuffed him. (*Id*.)

Officer Esteban Rivas asked Garcia about his current immigration status, and Garcia admitted to being unlawfully in the United States and having previously been deported. (*Id*.) The officers searched Garcia, and asked him if anyone else was inside. (*Id*.) Garcia responded that his two buddies were in the house. (*Id*.) Officer Rivera asked if they could talk to him inside, and Garcia consented. (*Id*.) The officers then entered Garcia's apartment.[3]

Officers Rivas and Carter entered Garcia's apartment, and Officer Rivera stayed behind with Garcia. (*Id*.) As the two officers entered Garcia's apartment, Officer Carter saw Defendants Perez and Salazar-Sandoval in the back of the apartment. (*Id*.) The officers identified themselves as the police, and Perez and Salazar-Sandoval ran into an adjoining room. (*Id*.) Both Perez and Salazar-Sandoval had items in their hands—Perez was carrying a box. (*Id*.) Officer Carter and Officer Rivas followed Perez and Salazar-Sandoval into the next room, as Officer Carter testified in his experience that "when you announce 'police' or 'let me see your

---

[2] Officer Rivera described the goose hold as a compliance technique in which he grabs the arrestee's elbow with his left hand, and holds both of the arrestee's hands with his right hand, then pushes the arrestee's hands in and pulls his elbow down. (10/27/2014 A.M. Tr.) He described it as a "minimal" amount of force that he uses routinely to gain the compliance of arrestees. (*Id*.)

[3] The government does not contend that Garcia agreed to a search of his apartment at this point, only that he agreed to let the officers enter the apartment. The government also agrees with Garcia that the administrative warrant for Garcia's arrest did not give the government authority to enter or search Garcia's apartment.

3

hands' and someone runs from you, something's not right and you need to find out what the problem is." (*Id.*) When Officer Carter reached Perez, Officer Carter turned to look over his shoulder into the next room and saw a package wrapped in duct tape and cellophane, which he believed was consistent with the packaging of narcotics. (*Id.*) As he scanned the room in front of him, Officer Carter also noticed drug paraphernalia on the table. (*Id.*) Specifically, he saw a white powder with cutting agents, cellophane, and baggies. (*Id.*)

At this time, the officers read all three Defendants their *Miranda* warnings in Spanish, which Defendants indicated they understood. (*Id.*) The officers then searched them. (*Id.*) At approximately this same time, Officer Carter conducted a protective sweep of the apartment. (*Id.*) As part of this sweep, he entered the bedroom outside of which Salazar-Sandoval and Perez had initially been detained. (*Id.*) Officer Carter found a kilo-sized brick next to the television stand, and two other bricks resting on a chair in plain view. (*Id.*) Officer Carter also saw the box which Perez had carried into the room when the officers arrived. (*Id.*) Officer Esteban Rivas then contacted the Homeland Security Investigations ("HSI") narcotics unit and the Chicago Police Department. (*Id.*)

Officer Rivera questioned Garcia as they awaited the arrival of the HSI agents. Officer Rivera asked Garcia about the drugs, and after initially denying they belonged to him, Garcia admitted they were his. (*Id.*) Officer Rivera then asked Defendants who lived in the apartment. (R. 91-3, at 2.) Garcia responded that he lived in the apartment with a roommate who was not present. (*Id.*) Neither Salazar-Sandoval nor Perez claimed to live in the apartment. (*Id.*)

At approximately 2:30 p.m., agents from the HSI narcotics unit arrived. (R. 91-2, at 3.) HSI Special Agent Travis Goff spoke with Garcia, with Officer Rivera translating. Special Agent Goff presented Garcia with a consent form written in Spanish to search his entire

apartment, which Officer Rivera read to Garcia in Spanish. (10/27/2014 A.M. Tr.); (*see* Gov. Hearing Ex. Consent Form.) Garcia also stated that he would be willing to cooperate with the officers, but he feared for his life, and so he did not want to cooperate with the other Defendants present. (10/27/2014 A.M. Tr.)

After Garcia signed the written consent to search, the HSI agents entered the bedroom where Officer Carter had initially encountered Salazar-Sandoval and Perez and discovered the kilo-sized, taped bricks. (R. 91-2, at 4.) In addition to the two bricks lying on the chair and the one brick lying on the floor next to the television stand, the agents discovered four additional bricks. (*Id.*) The HSI agents field-tested the bricks, which tested positive for the presence of cocaine. (*Id.*) The agents also recovered 1.87 kilograms of marijuana, 2.49 grams of methamphetamines, a scale, and $2,422 in U.S. currency from Garcia's apartment. (*Id.*)

After the search was completed, the HSI agents again read Perez his *Miranda* rights in Spanish, which Perez agreed to waive. (*Id.*) Perez stated that he resided at 7738 S. Keating Ave. in Chicago. (*Id.*)

## ANALYSIS

Garcia moves to suppress the evidence recovered against him on the grounds that he did not consent to the officers entering his apartment, and that he did not validly consent to the search of his apartment following his arrest by signing the written consent form. Perez moves to suppress the evidence recovered against him and to quash his arrest on the grounds that his arrest was unlawful, in part because Garcia did not consent to the officers entering his apartment.

"The Fourth Amendment protects citizens against unreasonable searches and seizures." *United States v. Richards,* 719 F.3d 746, 754 (7th Cir. 2013). "The jurisprudence of the Supreme Court makes clear that the primary bulwark against such conduct is the procurement of a warrant from a neutral and detached magistrate." *United States v. Whitaker,* 546 F.3d 902, 906 (7th Cir.

5

2008) (citing *Groh v. Ramirez,* 540 U.S. 551, 575, 124 S.Ct. 1284, 157 L.Ed.2d 1068 (2004)). Law enforcement officers generally may not enter into a private home without a warrant—in fact, unjustified entry into the home "is the 'chief evil' against which the Fourth Amendment is directed." *United States v. Sabo*, 724 F.3d 891, 893 (7th Cir. 2013). A well-established exception to the warrant requirement exists, however, where the resident of the home consents to the government's entry. *Id*. The government has to prove by a preponderance of the evidence that their entrance falls within this exception. *See United States v. Zahursky*, 580 F.3d 515, 521 (7th Cir. 2009); *United States v. Basinski*, 226 F.3d 829, 833 (7th Cir. 2000).

## I. Defendant Garcia's Motion to Suppress

Garcia moves to suppress the evidence recovered against him on two main grounds. First, he argues that he did not consent to the officers entering his apartment. Second, he claims that although he later signed a written consent form purporting to give the officers permission to search his apartment, his consent was not valid because he believed that he was consenting to deportation, not to a search of his apartment.

### A. Consent to Enter Residence

Garcia first argues that he did not consent to the officers' entry into his residence, and that the officers did not ask him for his consent before entering his apartment. The Court disagrees. After carefully weighing the demeanor and credibility of each witness, the Court finds that the government has established by a preponderance of the evidence that Defendant Garcia consented to the search of his apartment. With respect to the officers, they arrived at Garcia's residence to effectuate an immigration arrest, and Officer Rivera testified credibly that he did not suspect in any way that drugs were present in Garcia's apartment. (10/27/2014 A.M. Tr.) The officers were not motivated to pressure Garcia to gain entrance to his home. In fact, Officer

Rivera explained they had to call HSI and the Chicago Police once they found the narcotics because they could not take custody of the drugs as part of the immigration procedures. (10/27/2014 A.M. Tr.) The officers also testified to several facts that did not help the government's argument, which the Court finds enhances their credibility. Officer Rivera, for example, testified that he briefly placed Garcia in a "goose hold," and told him "we can do this the easy way or the hard way" in order to gain Garcia's compliance to place handcuffs on him. (*Id*.) Finally, the officers' testimony was consistent. Officer Carter, for example, testified that Garcia may have pulled away when the officers started to place him in handcuffs, and that the other officers controlled Garcia. (*Id*.) Carter also testified that the officers asked Garcia for consent to enter his residence, which Garcia granted. (*Id*.)

With respect to Garcia, the Court notes that he is motivated to avoid incarceration, which he admitted to during his testimony. (10/27/2014 P.M. Tr.) Garcia's testimony regarding his statements to the officers concerning his potential willingness to cooperate also casts doubt on his credibility. Officer Rivera testified that immediately after signing the consent to search form, Garcia told him that he was willing to cooperate, but that he feared for his life. (10/27/2014 A.M. Tr.) Garcia disputed that he told the officers he was willing to cooperate, but agreed that he told them that he was afraid for his family in Mexico. (10/27/2014 P.M. Tr.) When the government cross-examined Garcia on why he would tell the officers that he was afraid for his family in Mexico if he did not offer to cooperate, he stated that, "[w]ell, the way things are in Mexico, right now you don't know what can happen to people." (*Id*.) The government then asked him how that was connected to what was happening in his apartment, and Garcia responded, "Perhaps to you there isn't -- it doesn't have much to do with it, but to me it does. Because it's my family. I mean, I don't know where people are or who they are. Where is that

7

other guy that they picked up?" (*Id.*) Garcia's explanation for why he told law enforcement that he was afraid for his family in Mexico is not credible, and it casts doubt on the veracity of the rest of his testimony. (*Id.*)

Furthermore, Officer Rivera testified credibly that after arresting and searching Garcia, the officers asked him if anyone else was inside. (10/27/2014 A.M. Tr.) Garcia responded that his two buddies were in the house. (*Id.*) Officer Rivera then asked if the officers could speak to Garcia inside, and Garcia consented. (*Id.*) Officer Carter also testified that he believed one of the other officers asked Garcia for consent to enter his residence. (*Id.*) Although Garcia testified that the officers never asked his permission to enter his apartment, and that they entered his residence without receiving his consent, the Court finds the officers' testimony consistent and credible. (10/27/2014 P.M. Tr.) Their testimony is further bolstered by Garcia's later execution of the written consent form. (10/27/2014 A.M. Tr.) As such, the government established by a preponderance of the evidence that Garcia consented to the officers entering his apartment.

Given the Court's finding that Garcia consented to the officers' entry into his apartment, the next question is whether that consent was voluntary. Whether a defendant voluntarily consented to a search is a question of fact determined by examining the totality of the circumstances. *United States v. Lewis,* 608 F.3d 996, 999 (7th Cir. 2010). To make this determination, the courts consider (1) the defendant's age, intelligence, and education; (2) whether law enforcement advised the defendant of his constitutional rights; (3) how long the defendant was detained prior to giving consent; (4) whether the consent was immediate, or was prompted by repeated requests by law enforcement agents; (5) whether any physical coercion was used; and (6) whether the defendant was in custody. *United States v. Beltran*, 752 F.3d 671, 679 (7th Cir. 2014); *United States v. Risner,* 593 F.3d 692, 694 (7th Cir. 2010). In a totality of

the circumstances analysis, no single factor is determinative. *United States v. Figueroa-Espana*, 511 F.3d 696, 704 (7th Cir. 2007). The government bears the burden of proving by a preponderance of the evidence that consent was freely and voluntarily given. *Beltran*, 752 F.3d at 679; *see also United States v. Saadeh,* 61 F.3d 510, 517 (7th Cir. 1995).

The third and fourth factors weigh in favor of the voluntariness of Garcia's consent. The officers only briefly detained Garcia before he gave them consent to enter his apartment, which was prompted by a single request from the officers. (10/27/2014 A.M. Tr.) Although Garcia was in custody and the officers had not yet advised him of his constitutional rights, those facts by themselves do not make Garcia's consent involuntary. *See Beltran*, 752 F.3d at 679 (holding that defendant voluntarily gave consent to search despite being in handcuffs and not having been advised of his constitutional rights); *United States v. Renken*, 474 F.3d 984, 987-88 (7th Cir. 2007) (affirming district court's finding that consent was voluntary despite fact that defendant gave it while in custody and the officers had not given him *Miranda* warnings).

In addition, Garcia is thirty-seven years old, does not readily understand English and has a limited education. After initially attempting to communicate with Garcia in English, the officers spoke with Garcia in Spanish. (10/27/2014 A.M. Tr.) The United States has deported Garcia on at least four prior occasions, and Garcia testified that he went through deportation proceedings each time, which makes him more likely to be aware of his rights under the circumstances. (10/27/2014 P.M. Tr.); *see United States v. Duran*, 957 F.2d 499, 502 (7th Cir. 1992) (comparing level of knowledge of individual giving consent with that of an "experienced arrestee" because she was given warnings that she had a right to withhold consent and that evidence discovered in the search could be used against her). Garcia also testified that Chicago police officers have arrested him multiple times in the past, they have read him his rights on at

9

least several of those occasions, and he in fact knows his rights. (10/27/2014 P.M. Tr.) Finally, although Garcia only attended one year of school, this fact is relatively less important in light of Garcia's age, his frequent interactions with law enforcement, and his admission that he generally knows his rights. (*Id.*)

With respect to coercion, when Officer Rivera initially placed handcuffs on Garcia, Garcia tried to pull his left hand away. Officer Rivera placed a "goose hold" on him for two seconds, and told him that "we can do this the easy way or the hard way." (*Id.*) Garcia apologized, and Officer Rivera was able to handcuff him. (*Id.*) Officer Rivera testified that Garcia did not appear to be frightened or in physical pain, and characterized the "goose hold" as a minimal use of force that he uses regularly to gain the compliance of arrestees. (*Id.*) Notably, during his testimony Garcia did not mention the "goose hold," and did not otherwise claim that Officer Rivera used force during the arrest. He never stated that the officers harmed him. When Rivera asked Garcia if the officers could enter the residence, the Court credits Rivera's testimony that Garcia was calm and relaxed, he was not confused, he understood Rivera's question, and he gave his consent without hesitation. (*Id.*)

Although Garcia was in custody and had not been advised of his right to refuse consent, he was thirty seven years old and an experienced arrestee, at that point he had been in custody for a very short period of time, and the officers asked for his consent, which was not otherwise coerced, with a single request. Given the officers' credible testimony and the totality of the circumstances, the Court finds that Garcia voluntarily consented to the officers' entrance into his apartment.

### B. Protective Sweep

Although Garcia does not raise this issue in his motion, the Court has no difficulty finding that the government has established that upon entering Garcia's residence, but before Garcia consented to the search of his apartment, the officers recovered evidence through a lawful protective sweep. Officers can perform a protective sweep of a private home not incident to an arrest where the protective sweep is "justified by the concerns that an officer conducting an in-home arrest is at a disadvantage and that he is susceptible to an ambush in a confined setting of unknown configuration." *Leaf v. Shellnut*, 400 F.3d 1070, 1087 (7th Cir. 2005) (citing *Maryland v. Buie*, 494 U.S. 325, 327, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990) (quotation omitted)). When Officer Carter and Officer Rivera first entered the apartment and announced they were law enforcement officers, Perez ran from the officers into the adjoining room carrying a box. Carter testified that in his experience "when you announce 'police' or 'let me see your hands' and someone runs from you, something's not right and you need to find out what the problem is." (10/27/2014 A.M. Tr.) At that point, the officers were entitled to perform a protective sweep of the apartment for their safety. *See Leaf v. Shellnut*, 400 F.3d at 1087 (holding that protective sweep of residence was lawful where the officers "had substantial reason to believe their safety might have been at risk.") During that sweep, they discovered several kilo-sized bricks of cocaine in the adjoining room, and the drug evidence on the living room table.[4] (10/27/2014 A.M. Tr.)

---

[4] Officer Carter testified that during the protective sweep he opened the box that Perez carried away from the officers when they first entered the apartment and looked inside. (10/27/2014 A.M. Tr.) The HSI agents later discovered additional bricks of cocaine in this box during their search. (R. 91-2, at 4.) Garcia does not address this issue, but even assuming that Officer Carter's actions were not proper, based on the doctrine of inevitable discovery the Court would not exclude that evidence. "When a warrant is *sure* to issue (if sought), the exclusionary 'remedy' is not a remedy, for no legitimate privacy interest has been invaded without good justification, but is instead a substantial punishment of the general public." *United States v. Tejada*, 524 F.3d 809, 813 (7th Cir. 2008) (quoting *United States v. Elder*, 466 F.3d at 1090, 1091 (7th Cir. 2006)). The officers lawfully conducted a protective sweep

C.     **Consent to Search Residence**

Garcia also argues that he did not consent to the search of his apartment by signing the written form purportedly consenting to the search. Although he acknowledges that he signed the form, he argues that the waiver was unknowing and invalid because it was signed after the officers had already illegally entered his apartment, and because he believed that the form was a consent to deportation, not a search.

As discussed above, the officers did not illegally enter Garcia's apartment. That leaves Garcia's argument that he believed the form was a consent to deportation, not a search. For the reasons previously stated, the Court credits the testimony of the officers over the testimony of Garcia. The officers testified consistently and credibly, and the Court notes that they did not suspect that Garcia's apartment contained drugs so they were not motivated to seek entry on that basis. The Court credits Officer Rivera's testimony that HSI Special Agent Goff presented Garcia with the consent to search form. (10/27/2014 A.M. Tr.) In addition, the form is written entirely in Spanish, with the sole exception of the area to be searched. (Gov. Hearing Ex. Consent Form.) Officer Rivera explained the form to Garcia in Spanish, and read him the entire form, which included translating the English-language description of the area to be searched, Garcia's "whole apartment," into Spanish. (10/27/2014 A.M. Tr.); (Gov. Hearing Ex. Consent Form.) Garcia then signed the form. (10/27/2014 A.M. Tr.) Rivera's account is also supported by Garcia's statement that he was willing to cooperate with the government immediately after he signed the form. (*Id.*)

Garcia's consent was also voluntary. As previously discussed, the Court considers (1) the defendant's age, intelligence, and education; (2) whether law enforcement advised the

---

of the apartment and had already discovered other drug evidence. At that point, if they had applied for a warrant to search the residence it would certainly have issued. *See Tejada*, 524 F.3d at 813-814.

defendant of his constitutional rights; (3) how long the defendant was detained prior to giving consent; (4) whether the consent was immediate, or was prompted by repeated requests by law enforcement agents; (5) whether any physical coercion was used; and (6) whether the defendant was in custody. *Beltran*, 752 F.3d at 679; *Risner,* 593 F.3d at 694. The government bears the burden of proof to show that the defendant's consent was voluntary. *Beltran*, 752 F.3d at 679.

As discussed previously, Garcia has a very limited educational background, but he is 37 years old, experienced with the criminal justice system, and testified that he knows his rights. None of the officers threatened or physically coerced Garcia into consenting to the search, and there is no evidence that the officers subjected Garcia to multiple requests for his consent. (10/27/2014 A.M. Tr.) Further, the Court credits Officer Rivera's testimony that by this point the officers had read Garcia his *Miranda* warnings in Spanish, which he stated that he understood, and that Garcia told the officers he wanted to cooperate after signing the consent form. (*Id*.) Although the officers detained Garcia for several hours, that fact does not render Garcia's consent involuntary. *See United States v. Pineda-Buenaventura*, 622 F.3d 761, 777-778 (7th Cir. 2010) (affirming decision of district court that defendant's consent to search was voluntary where police held defendant in custody at police station for over an hour, but where police gave defendant *Miranda* warnings, spoke to him in his native Spanish, and defendant executed written consent form agreeing to search).

## II.     Defendant Perez's Motion to Suppress and Quash Arrest

Perez moves to quash his arrest and suppress physical evidence recovered and statements obtained from him during the government's warrantless entry into Garcia's home. In his briefing, Perez focuses almost exclusively on the argument that the government did not have probable cause to arrest him, and accordingly, that the Court should suppress the evidence

recovered at Garcia's home. There are several problems with this argument. First, Perez did not submit an affidavit in support of his motion and attempts to rely on alleged inconsistencies in the officers' reports and testimony alone to show that the government did not have probable cause to arrest him. Although Perez is required to make specific, detailed allegations to obtain an evidentiary hearing, the Court did grant him an evidentiary hearing on one limited factual issue, as explained below. He did not, however, provide any specific, detailed allegations on this issue. Second, Perez's argument fails to address, or only briefly touches on, two crucial issues. The first is whether Perez had a reasonable expectation of privacy in Garcia's apartment sufficient for Perez to challenge the government's search. The second is that even if Perez could successfully show that the officers unlawfully arrested him, he can only suppress evidence that has a sufficient causal connection to the illegal arrest. Finally, Perez moves to quash his arrest on the grounds that the officers did not have probable cause to arrest him. The Court will examine each of these issues in turn.

  **A. Evidentiary Hearing**

First, Perez argues that the government did not have probable cause to arrest him, and thus, the Court should suppress the evidence recovered at Garcia's home as to him. As an initial matter, Perez argues that he is entitled to an evidentiary hearing on this issue. Perez chose to not submit an affidavit with his motion, stating that "[t]he government's facts alone establish, as a matter of law, that Mr. Perez was arrested without probable cause. This motion requires no affidavit from Mr. Perez." (R. 66, Perez Mot. to Supp., at 1.) In his reply brief, however, Perez identifies several alleged inconsistencies in the officers' reports that he contends entitle him to an evidentiary hearing.

"Evidentiary hearings are warranted only when the allegations and moving papers are sufficiently definite, specific, non-conjectural and detailed enough to conclude that a substantial claim is presented and that there are disputed issues of material fact which will affect the outcome of the motion." *United States v. Villegas*, 388 F.3d 317, 324 (7th Cir. 2004). As Perez does not submit an affidavit, the only allegations he can point to in support of an evidentiary hearing are alleged inconsistencies in various reports and testimony given by the officers. (R. 91, Perez Reply.) Out of the three factual issues Perez identifies,[5] the only issue where there is even arguably a material factual dispute is whether the officers saw illegal drugs in plain view on the table during Perez's arrest.[6] Accordingly, the Court granted Perez an evidentiary hearing solely on that limited issue.

### B.     Perez Had No Reasonable Expectation of Privacy in Garcia's Apartment

Perez's argument that the Court should suppress the evidence recovered as to him does not address whether Perez has a reasonable expectation of privacy in Garcia's apartment. "[I]n order to claim the protection of the Fourth Amendment, a defendant must demonstrate that he personally has an expectation of privacy in the place searched, and that his expectation is reasonable." *Minnesota v. Carter*, 525 U.S. 83, 88, 119 S.Ct. 469, 142 L.Ed.2d 373 (1998) (citing *Rakas v. Illinois*, 439 U.S. 128, 143-44, and n. 12, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978)).

---

[5] The other two issues are i) whether Perez ran from the agents as they entered the department, or merely walked away from them; and ii) whether the agents' initial detention of Perez immediately constituted an "arrest," or instead was an investigatory *Terry* stop that quickly developed into an arrest. (R. 91, at 3-4.) On the first issue, under either factual scenario the officers would be entitled to follow Perez further into the apartment for their safety. On the second issue, the exact timing of when the initial detention became an arrest is irrelevant. Even if the officers technically arrested Perez immediately before they obtained probable cause, Perez could not suppress his arrest or any evidence recovered for the reasons discussed in detail below.

[6] Even this issue is arguably not material because if the government illegally arrests a defendant, the defendant can only suppress evidence that has a sufficient causal connection to the arrest. As discussed in detail below, the evidence recovered does not have such a connection to Perez's arrest.

"[A]n overnight guest in a home may claim the protection of the Fourth Amendment, but one who is merely present with the consent of the householder may not." *Carter*, 525 U.S. at 90.

In *Minnesota v. Carter*, the Supreme Court held that an individual did not have a reasonable expectation of privacy in the apartment of another when he was there for the sole purpose of packaging cocaine. *Id*. at 91. The Court reasoned in part that "the purely commercial nature of the transaction," and "the relatively short period of time on the premises," made the defendant's situation more analogous to a defendant who is "simply permitted on the premises" than an overnight guest. *Id*. An overnight guest has a reasonable expectation of privacy while an individual permitted on the premises does not. *Id*. The facts here are similar. Perez does not claim that as of December 11, 2013 he lived in Garcia's apartment or that he was an overnight guest. There is no evidence suggesting otherwise. In fact, he stated to the officers that he lived at a different address in Chicago. (R. 91-2, at 4.) Like the defendant in *Carter*, Perez gives no reason for being present at the apartment other than to participate in the alleged illegal drug activity.

Further, *United States v. Johnson* does not apply to the facts of this case. *United States v. Johnson*, 380 F.3d 1013 (7th Cir. 2004). In *Johnson*, the Seventh Circuit held that where law enforcement had obtained evidence from an illegal search of Individual A, and that evidence was used to provide probable cause to search the car of Individual B, then Individual B was entitled to suppress the evidence recovered in that search. *Id*. at 1015-1018. That is not the situation here. As the government notes in its sur-reply, *Johnson* in fact affirms the general principle that an individual cannot suppress evidence against him that was obtained in violation of the rights of a second individual, noting that "normally *A* cannot challenge the legality of the search of *B* even where the search produces information used to convict *A*." *Id*. at 1015.

For these reasons, Perez did not have a reasonable expectation of privacy in Garcia's apartment, and he cannot suppress evidence recovered from it on the grounds that it was obtained through the officers' warrantless entrance or search.

### C. Perez's Arrest Was Lawful

Additionally, even if Perez could show that he had a reasonable expectation of privacy in Garcia's apartment, Perez's arrest was lawful because the officers had probable cause to arrest him. *See United States v. Beltran*, 752 F.3d at 678. As the two officers entered Garcia's apartment, Officer Carter saw Defendants Perez and Sandoval in the back of the apartment. (10/27/2014 A.M. Tr.) The officers identified themselves as the police, and Perez and Sandoval ran into an adjoining room. (*Id.*) Both Perez and Sandoval had items in their hands—Perez was carrying a box, and Officer Carter and Officer Rivas followed Perez and Sandoval into the next room. (*Id.*) Officer Carter testified that in his experience "when you announce 'police' or 'let me see your hands' and someone runs from you, something's not right and you need to find out what the problem is." (*Id.*) As Officer Carter walked further into the apartment and confronted Perez, Officer Carter turned to look over his shoulder into the next room and saw a package that he believed to be wrapped consistently with the packaging of narcotics. (*Id.*); (Gov. Hearing Ex. Photo 14.) At this point, he placed Perez under arrest. (*Id.*) As he scanned the room in front of him, Officer Carter also saw drug paraphernalia on the table. (*Id.*); (Gov. Hearing Ex. Photo 9.) Specifically, he testified that he saw a white powder on the table with cutting agents, cellophane, and baggies. (*Id.*)

Officer Rivera confirmed Officer Carter's account that the table had drug paraphernalia on it. Officer Rivera testified that after following the other officers into the apartment, he saw the following on the same table:

> On top of the table, we -- I saw white powdery substance. I saw a little bundle wrapped in -- wrapped around, which looked like rock cocaine. We saw a different type of drug paraphernalia, cellophane paper, plastic baggies. Inside a black bag on top of the table there was also a box of ammunition and various drug paraphernalia on there.

(*Id.*); *see also* (Gov. Hearing Exs. Photo 9-12).

As such, the officers had probable cause to arrest Perez.

### D. Causal Nexus of Perez's Arrest to the Recovered Evidence

The next issue is whether law enforcement recovered the evidence Perez seeks to suppress "as a result of" his arrest. Even assuming that the government's arrest of Perez was unlawful, Perez may successfully suppress this evidence only if the government's discovery of the evidence was sufficiently causally connected to the arrest. "Evidence is not automatically tainted 'simply because it would not have come to light but for the illegal actions of the police.'" *United States v. Meece*, 580 F.3d 616, 619 (7th Cir. 2009) (quoting *Wong Sun v. United States,* 371 U.S. 471, 487–88, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963)). "There must be some causal nexus between the illegal police activity and the disputed evidence." *United States v. Meece*, 580 F.3d at 619. "The evidence may be purged of the taint by a finding that it was discovered by an independent source, that it would inevitably have been discovered without the unlawful search, or that its discovery is sufficiently distant in causal connection from the illegal search so as to attenuate the connection between the two." *United States v. Swift*, 220 F.3d 502, 507 (7th Cir. 2000); *see also United States v. Slone*, 636 F.3d 845, 848-49 (7th Cir. 2011).

Here, there is no indication that the officers recovered any evidence as a result of the arrest of Perez. When the officers entered the apartment and announced they were police, Perez ran from the officers into an adjoining room carrying a box. (10/27/2014 A.M. Tr.) Carter testified that in his experience "when you announce 'police' or 'let me see your hands' and someone runs from you, something's not right and you need to find out what the problem is."

(*Id.*) As discussed above, at that point the officers were entitled to perform a protective sweep of the apartment for their safety. *See Leaf v. Shellnut*, 400 F.3d at 1087 (holding that officers can perform a protective sweep of a private home not incident to arrest where the protective sweep is "justified by the concerns that an officer conducting an in-home arrest is at a disadvantage and that he is susceptible to an ambush in a confined setting of unknown configuration.") (citation omitted). As such, the officers did not recover the evidence "as a result of" their arrest of Perez.[7] As the government notes, the facts here are distinguishable from cases where the officers conducted an illegal search of the defendant's person and the court suppressed the evidence as a result. *See United States v. Ienco*, 182 F.3d 517, 526-28 (7th Cir. 1999). The officers did not recover any evidence from their search of Perez, and there is simply not the same causal connection here between the allegedly illegal arrest and the recovered evidence.

### E. Motion to Quash Arrest

Finally, Perez moves to quash his arrest. This argument is unsuccessful for several reasons. First, as discussed above, the government had probable cause to arrest Perez and his arrest was lawful. Second, Perez fails to address the government's argument, also addressed above, that he did not have a reasonable expectation of privacy in Garcia's apartment sufficient to challenge the officers' entry. Accordingly, Perez cannot object to his arrest based on the fruits of the officers' search of Garcia's apartment, even if that search was illegal (which it was not). Finally, even if Perez was briefly arrested illegally, which the Court finds that he was not, "an illegal arrest, without more, has never been viewed as a bar to subsequent prosecution." *United States v. Crews*, 445 U.S. 463, 474, 100 S.Ct. 1244, 63 L.Ed.2d 537 (1980); *see Tillman v. Robert*, No. 12-C-524, 2013 WL 2156249, at *2 (N.D. Ill. May 17, 2013) (Feinerman, J.) A

---

[7] The officers did not recover the box Perez was carrying when the officers entered the apartment as a result of their arrest of Perez because Perez placed it in the adjoining room before the officers arrested him. (10/27/2014 A.M. Tr.) The officers then discovered it during their protective sweep. (*Id.*)

defendant "is not a suppressible 'fruit' and the illegality of his detention cannot deprive the Government of the opportunity to prove his guilt." *Matta-Ballesteros v. Henman*, 896 F.2d 255, 260 (7th Cir. 1990); *see* Tillman, 2013 WL 2156249, at *2. For these reasons, Perez's motion to quash his arrest is denied.

## CONCLUSION

For the foregoing reasons, the Court denies Defendants' motions to suppress evidence.

**DATED:  December 1, 2014**                              **ENTERED**

*[signature: Amy J. St. E]*

AMY J. ST. EVE
U.S. District Court Judge